UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

ANTHONY MEEKS,

        Plaintiff,                        Case No. 2:16-cv-174

v.                                                  Honorable Gordon J. Quist

JEFFREY WOODS et al.,

        Defendants.
_____/

## OPINION

This is a civil rights action brought by a state prisoner pursuant to 42 U.S.C. § 1983. The Court has granted Plaintiff leave to proceed *in forma pauperis*. Under the Prison Litigation Reform Act, PUB. L. NO. 104-134, 110 STAT. 1321 (1996), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, Plaintiff's action will be dismissed for failure to state a claim.

### Factual Allegations

Plaintiff Anthony Meeks presently is incarcerated with the Michigan Department of Corrections (MDOC) at the Macomb Correctional Facility (MRF). Plaintiff's complaint, however, alleges constitutional violations that occurred at three other MDOC facilities: Chippewa

Correctional Facility (URF); Alger Correctional Facility (LMF); and Kinross Correctional Facility (KCF).  He sues URF Warden Jeffrey Woods; URF Inspector Pete Hubbard; URF Resident Unit Managers (RUMs) G. McLead and D. Lalonde; URF Property Room Officer R. Hansen; LMF Warden Catherine Bauman; LMF RUMs (unknown) Schrame and D. Benman; LMF Property Room Officer (unknown) Staseroich; KCF Warden Duncan MacLaren; KCF Correctional Officers Unknown Party #1, Unknown Party #2, and Unknown Party #3; and Property Transfer Officers Unknown Part(y)(ies) #4.

On February 23, 2015, Plaintiff transferred from the Thumb Correctional Facility to URF.  When he arrived at URF, he was placed in observation for one day before being placed in general population.  Once Plaintiff had been moved to general population, Defendant Hansen called him to get his property.  However, Hansen did not give Plaintiff his property at that time.  On February 26, 2015, Hansen called Plaintiff again to get his property.  When Plaintiff arrived, his property was laid out on a table and Defendants Hubbard and Hansen were in the room.  Hansen had two screwdrivers in his hand.  Plaintiff alleges that Defendant Hansen pretended to go through Plaintiff's property with him.  Hansen picked up Plaintiff's radio and pretended to unscrew the back, although the radio already appeared to have been pried open and cracked.  Hansen purportedly found contraband in the radio, and Defendants Hansen and Hubbard escorted Plaintiff to segregation.  Sometime in March, Plaintiff received a contraband removal notice and a misconduct report dated February 26, 2015, which reported the removal of Plaintiff's "G.E. Super radio II, 1 footlocker, 1 Smith Corona typewriter, 2 Ribbons, 1 pair of bread [sic] trimmer with a battery pack, 1 green sweat pant, 1 Hoppy Craft Clock, 1 Panasonic tape player, 1 tape case and 31 cassette tapes." (Compl., ECF No. 1, PageID.10.)  On March 23, 2015, Defendant McLead came to Plaintiff's segregation cell and conducted an administrative hearing.  McLead allegedly refused to investigate

Plaintiff's claims. McLead indicated that another prisoner's number was on the footlocker and sweatpants, but McLead could not answer Plaintiff's question about whose number was on the items. McLead took all of Plaintiff's property, except the 31 tapes, telling Plaintiff that he could keep 24 of the tapes if he ordered a new tape player. Plaintiff asked to have the rest of the property sent home.

On April 7, 2015, Plaintiff was told by an unknown officer that he was being transferred. The officer brought Plaintiff his property and told Plaintiff that anything that did not fit in his footlocker would be thrown away. While his property was being itemized for transfer, Plaintiff noticed that some hobby-craft pens, glue, and store goods were missing.

Plaintiff was transferred to Level IV at LMF on April 8, 2015. An unknown Assistant Deputy Warden informed Plaintiff that he would be at Level IV for at least ninety days. Defendant Staseroich called Plaintiff to the property room. Staseroich began itemizing Plaintiff's property with Plaintiff. Staseroich took two pairs of sweatshirts and sweatpants, three large towels, three middle-size towels, three big dry towels and two bags of sugars, informing Plaintiff that he could not have the items. Plaintiff responded that he wanted the items held, in accordance with policy, until he was transferred back to Level II. Defendant Staseroich told Plaintiff that he did not have the room to store the items. Staseroich told Plaintiff to put away his other property and go to lunch, but to return after lunch. Plaintiff, however, could not get back to the property room, so he sent his block representative. The block representative told Plaintiff that he saw some of Plaintiff's property in the trash. Staseroich told the representative that he could pull it out of the trash if he wanted to, but the representative refused.

While Plaintiff was housed in the Level IV unit at LMF, he showed Defendant Benman his Administrative Hearing Report from URF, telling her that he had to order a new tape

- 3 -

player in order to get his 31 cassette tapes from URF. Benman gave Plaintiff a disbursement form, and he ordered a tape player and a beard trimmer. Benman also told Plaintiff that she would call URF to have Plaintiff's tapes transferred. In July 2015, Defendant Benman called Plaintiff down to her office, where she had his new tape player and beard trimmer, as well as his 31 cassette tapes. Benman held an administrative hearing on the tapes, after which she gave Plaintiff 24 of the cassettes. She had Plaintiff complete a disbursement form to send the other 6 cassettes home. Later in July, an unknown officer told Plaintiff that he was being transferred and then itemized Plaintiff's property for transfer.

Plaintiff was transferred to KCF sometime in July 2015. When he arrived, an unknown officer itemized and unpacked Plaintiff's property. The officer took Plaintiff's cable cord, saying that Plaintiff would not need the cord, as the cells had cable cords in the walls. The officer told Plaintiff that he would get the cord back when he transferred out of KCF. Within one and one-half weeks, Plaintiff was again placed on observation in segregation, where he remained until October 2015. While he was in segregation, his disbursement authorization form was returned to him because there were insufficient funds in his prisoner trust account to mail the tapes home. As a consequence, the tapes were not sent home. About a week later, on October 16, 2015, Plaintiff was informed by an unknown officer that he was again being transferred. The officer put Plaintiff in the day room for about an hour. Two unknown officers subsequently walked Plaintiff to the control center to await transfer.

Plaintiff was transferred back to URF shortly thereafter. When he arrived, he was placed on observation in the segregation unit. Plaintiff did not know if his property had been transferred with him. He was let out of segregation on December 9, 2015. Defendant LaLonde came to Plaintiff's new cell with a contraband removal form and a misconduct report. The

documents had been prepared months earlier, but Plaintiff had not seen them before. The contraband removal form stated that Plaintiff's television had been damaged and his footlocker, headphones, and 24 cassette had been taken. That same date, Defendant LaLonde held a hearing on the misconduct about the property. Plaintiff asked about the rest of his property, and LaLonde responded that it was in another building and would be sent over later to be packed up for transfer. LaLonde admitted that Defendant Hansen had broken the television. Plaintiff complained to LaLonde about a variety of things, including a complaint that Hansen should not have unpacked Plaintiff's property while Plaintiff was in segregation and that Defendant McLead had told Plaintiff that he would get the tapes back. Defendant LaLonde allegedly failed to investigate, so Plaintiff asked to have the property sent home. Plaintiff waited for the rest of his property, expecting to itemize it with an officer. He was then told that his property had already been packed without him.

Plaintiff arrived at MRF on December 10, 2015. Officer Hightower called Plaintiff to itemize and receive his property. Plaintiff saw that his new tape player had been broken and that some of his legal and religious property was missing. Officer Hightower advised Plaintiff that he would call URF about the missing property. Plaintiff also spoke with Counselors Moses and Williams about the missing property. They told Plaintiff that they had called and emailed Defendant LaLonde about the missing property, but they had not received a response. On January 27, 2016, Counselor Williams held a hearing with Plaintiff on certain legal material that came from URF. Plaintiff advised Williams that the material did not comprise all of his legal and religious property. Williams again advised that she would contact URF.

Plaintiff complains that the described actions violated MICH. DEP'T OF CORR., Policy Directive 04.07.112 ¶¶ B, S, U, V, WW, and LL. He also alleges that the issuance and review of his misconduct tickets violated MICH. DEP'T OF CORR., Policy Directive 03.03.105 ¶¶ YY, AAA,

BBB, and WWW. Further, he alleges that he was deprived of an appropriate process under MICH. DEP'T OF CORR., Policy Directive 03.02.130 ¶¶ F(2) and G(3).

Plaintiff contends that he has rights under the First and Fourteenth Amendments to freedom of expression on matters of public concern and to seek redress of grievances. He also alleges that he has a right not to be subjected to retaliation for the exercise of his right to freedom of expression. Plaintiff contends that he has been deprived of his right to property without due process of law. He seeks compensatory and punitive damages.

## Discussion

### I. Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the

pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting FED. R. CIV. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(I)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### A. Due Process

Plaintiff's due process claim is barred by the doctrine of *Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled in part by Daniels v. Williams*, 474 U.S. 327 (1986). Under *Parratt*, a person deprived of property by a "random and unauthorized act" of a state employee has no federal due process claim unless the state fails to afford an adequate post-deprivation remedy. If an adequate post-deprivation remedy exists, the deprivation, although real, is not "without due process of law." *Parratt*, 451 U.S. at 537. This rule applies to both negligent and intentional deprivation of property, as long as the deprivation was not done pursuant to an established state procedure. *See Hudson v. Palmer*, 468 U.S. 517, 530-36 (1984). Because Plaintiff's claim is premised upon allegedly unauthorized acts of a state official, he must plead and prove the inadequacy of state post-deprivation remedies. *See Copeland v. Machulis*, 57 F.3d 476, 479-80 (6th Cir. 1995); *Gibbs v. Hopkins*, 10 F.3d 373, 378 (6th Cir. 1993). Under settled Sixth Circuit authority, a prisoner's failure

to sustain this burden requires dismissal of his § 1983 due-process action. *See Brooks v. Dutton*, 751 F.2d 197 (6th Cir. 1985).

Plaintiff has not sustained his burden in this case. Although he recites the *Parratt* rule in his complaint, he utterly fails to allege that post-deprivation remedies were inadequate. Numerous state post-deprivation remedies are available to Plaintiff. First, a prisoner who incurs a loss through no fault of his own may petition the institution's Prisoner Benefit Fund for compensation. MICH. DEP'T OF CORR., Policy Directive 04.07.112, ¶ B (effective Dec. 12, 2013). Aggrieved prisoners may also submit claims for property loss of less than $1,000 to the State Administrative Board. MICH. COMP. LAWS § 600.6419; MDOC Policy Directive 03.02.131 (effective Oct. 21, 2013). Alternatively, Michigan law authorizes actions in the Court of Claims asserting tort or contract claims "against the state and any of its departments, commissions, boards, institutions, arms, or agencies." MICH. COMP. LAWS § 600.6419(1)(a). The Sixth Circuit specifically has held that Michigan provides adequate post-deprivation remedies for deprivation of property. *See Copeland*, 57 F.3d at 480. Plaintiff does not allege any reason why a state-court action would not afford him complete relief for the deprivation, either negligent or intentional, of his personal property. Accordingly, Plaintiff's due process claims will be dismissed.

### B. First Amendment

Plaintiff broadly asserts that he has a right under the First Amendment to freely speak on matters of public importance. He also alleges that he has a right to petition government and to be free from retaliation. Finally, he contends that he has a right to be free from retaliation for filing grievances and the instant lawsuit about the destruction and taking of his property.

Plaintiff's allegations concerning his rights are wholly unsupported by factual allegations that any Defendant actually violated his First Amendment rights. Indeed, Plaintiff

alleges no conduct by any Defendant that prevented him from speaking, prevented him from petitioning government or retaliated against him. Plaintiff's entire complaint revolves around Defendants' repeated interference with his property, and he alleges no injuries caused by or arising out of his exercise of First Amendment rights. Under these circumstances, Plaintiff utterly fails to allege a violation of the First Amendment.

## Conclusion

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's action will be dismissed for failure to state a claim pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c).

The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). For the same reasons that the Court dismisses the action, the Court discerns no good-faith basis for an appeal. Should Plaintiff appeal this decision, the Court will assess the $505.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from proceeding *in forma pauperis*, e.g., by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $505.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A Judgment consistent with this Opinion will be entered.


Dated: October 19, 2016            /s/ Gordon J. Quist
                                    GORDON J. QUIST
                                    UNITED STATES DISTRICT JUDGE